Mr. Santiago is a gay man and a transgender rights advocate from the indigenous state of Guero in Mexico, where the police have abandoned their duty to enforce the law. Accordingly, if Mr. Santiago is returned home, he would face the same fate as his brother, who was murdered for being gay without any intervention from the Mexican government. Now, if your honors won't direct me in a different direction, I'd like to begin with the government acquiescence piece. And I'll direct your attention to the bottom of page 61 of the record in which the immigration judge wrote that Mr. Santiago has failed to establish that the crack PC would acquiesce in his torture. Now, the government acquiescence inquiry under CAT asks whether a public official acting in official capacity would acquiesce. The crack PC is a community police group, which is not a state-sanctioned organization. And so, therefore, it has no bearing on the government acquiescence analysis. I mean, is your argument that the agency improperly considered this as going to acquiescence? Because the opinion, both opinions are pretty lengthy. And they're discussing whether the petitioner has shown that it would be more likely than not that he would be tortured with the acquiescence of the government. And the CPAC evidence could go to the first part of that, right? I mean, the likelihood that he would be injured on return. Sure, it can go to that end. But I think the record establishes that even the immigration judge on 61 of the record indicates that violence is still going on. So the crack PC is not able to protect Mr. Santiago. And that does go towards the more likely than not point. However, with regard to the government acquiescence piece, which really was the linchpin of the immigration judge's decision, the crack PC cannot be used as a fill-in for a government entity. And that's exactly what the immigration judge did here. And then while it's irrelevant in that respect, the crack PC is important here to the government acquiescence inquiry because it shows an absence of law enforcement. Dr. Olson and other reports within the record show that the crack PC is established because the community felt like the police were not doing their job. And so for that reason, it shows that there's government acquiescence in this case. So that's it. Can I just ask you, Mr. Nix? Yes, ma'am. Yes. So accepting for the sake of argument your position that the existence of the crack PC doesn't show or doesn't sort of support the idea that there would not be government acquiescence, assuming I accept that, what evidence is there then that goes specifically to the proper authorities? Because your position is well taken that it is about government acquiescence. And of course, that's not a government agency. And so what is there that supports the idea of official Mexican government acquiescence and torture or acquiescence or what have you? Well, Your Honor, there's the letter from the police superintendent of Mr. Santiago's hometown. And what the letter outlines is that Mr. Santiago should stay, quote, stay away from here lest he befall the same fate as his brother. And so by the very language of that letter, he's saying, don't come back here because my colleagues will acquiesce in your torture. He says to stay in America, a country that can, quote, offer you support and protection. And by saying that, he's saying, we cannot offer you support and protection. So don't come back here. And that letter. Does that establish acquiescence or does that establish, there are many governments, sadly, around the world that are unable to protect all their citizens. Is that enough for government acquiescence and torture? Your Honor, in this case, this isn't a matter of inability. This is a matter of intentional abandonment. And the record shows that in two ways. One, the Mexican government participates in this violence. The record on 425 says that they perpetrate this violence and they actually incite violence against gay individuals. Furthermore, this court's sister circuit in Joshua James v. Barr says that the, found that the Mexican government participates in violence against LGBTI individuals. If the government has the time, energy, and capacity to commit human rights abuses, it has that time, energy, and capacity to actually do its job. And the second point that shows that this is not simply inability, but willful abandonment of its job, is that there's evidence that the Mexican government does not prosecute, nor does it investigate crimes against gay individuals. And even in cases where there is an investigation and a finding of fault, the record shows that the Mexican government actually releases those people who have committed homophobic crimes. And so this is not inability, but this is an intentional abandonment. And the record is replete with things that show government acquiescence in this case. And the immigration judge misread the letter. It misread the existence of the crack PC. And it didn't address the evidence which I just mentioned. Remind me, is there country condition evidence in the record? Yes, your honor. Remind me of what the substance of that is. The State Department. Remind me what the State Department is. Is there State Department country condition evidence in the State Department reports on New Mexico? Yes, your honor. There is. Is it in the record? Yes, sir. And what does it say? Well, the State Department has found that, for one, the United States has refused to allow its employees to travel to Guero, where Mr. Santiago is from in Mexico. And there's that evidence. And also, the State Department does show on 444, I believe, that the Mexican government does not investigate crimes taken against gay individuals. And so, the evidence here does show government acquiescence. And as my time runs out, I'd like. What relief are you looking for? Say again? What relief are you looking for? Your honor, I think the record here compels this court to come to a different conclusion than the immigration judge did. And at the very minimum. What conclusion might that be, in your view? That Mr. Santiago has failed to show government acquiescence. And that finding was incorrect. And so, we'd ask this court to at least remand back to the agency to properly consider the role of the crack PC and to properly consider the evidence in which I've set forth here, as well as to properly view the evidence in the aggregate, which the immigration judge did not do. Is your client still detained in Louisiana? Yes, ma'am. And how long has he been detained? I believe since 2018. I'd have to double check. But I am running out of time. Can I ask you? I'm sorry. I just wanted to ask you a question regarding the claim you're making regarding the testimony or the lack of testimony from Dr. Olson. Yes, ma'am. And I think one of the questions is sort of, was an assertion made as to what Dr. Olson could testify to further in regards to acquiescence that was not in her report? Your Honor, so the first thing I'd say to that end is that when Mr. Santiago's attorney was trying to tease that out and actually establish a record, the immigration judge interrupted her. And when she said, I'd like Dr. Olson to testify too, in the record there's a dash because the immigration judge didn't let her finish. However, what we do know is that she was qualified to testify about the crack PC and the country condition generally, specifically as it goes to government acquiescence. And the immigration judge pointed out three instances in which Mr. or Dr. Olson's report was insufficient. And all of those instances she could have established on oral testimony. And one being that Dr. Olson didn't provide specific examples of when the crack PC had released a prisoner for restorative justice. Dr. Olson could have easily teased that out in testimony. Another time the immigration judge found that Dr. Olson's report was unpersuasive because of the existence of the crack PC. And therefore, Mexican authorities would not acquiesce. But again, Dr. Olson could have answered that question if given a chance to testify and say I'm not talking about the crack PC, I'm talking about the Mexican authorities. And finally, the immigration judge found that Dr. Olson's report was insufficient because of that Ms. Dr. Olson didn't specifically argue that the crack PC would commit LGBTI-based violence against Mr. Santiago. And that's again something Dr. Olson could have fielded that question in live testimony and answered it and provided examples. And so the immigration judge faulting the report in those three ways without giving her the chance to testify, violates Mr. Santiago's due process rights. Thank you. Thank you. Good morning. Virginia Lum for the United States of America. The agency's recent decision finding that petitioner in this case failed to establish eligibility for cat protection is supported by substantial evidence. He's claiming that were he likely to be removed to Mexico, he would be tortured by the government or not protected by the government. There's substantial evidence in the record and there's no compelling evidence to the contrary. Petitioner suggests that there's government acquiescence. Your honors, there's no government acquiescence unless the government knows about petitioner's particular circumstance. In this case, petitioner has been here since 2007. I also would like to interject. I believe he has been detained. He's well acquainted with our legal system. He was convicted in 2013 for animal cruelty, served 344 days, a year in prison. 2019, yes. What was animal cruelty? He was convicted of something called aggravated cruelty to animals. What is that? Yes. I believe it was for torturing and killing a cat. And he was. He spent a year in jail for killing a cat. Yes, your honor. But subsequently. Where did this conviction take place? I believe it was in a state. It's in the record. What state? I don't know exactly, your honor. And I don't believe it amounts, it's not a, amount to an aggravated felony which would affect this case. He was subsequently convicted in 2019, years later, for first of all, touching a minor female, criminal trespass. So he's well acquainted with the legal system. He. So how long has he been detained? How long has he been locked up? I don't know the exact date, but he's currently detained. And he's recently requested bond, but because of the seriousness of his previous convictions, I believe he was denied bond. Those were both, I mean, I think we're getting a little off the track. Yes. Because I want to pull you back to the substantial evidence. Thank you, your honor. He has had seven hearings before the Immigration Court. And five of the. I'm sorry, just to help focus you in a little bit. What you started out by saying that there was substantial evidence supporting that he, you know, the finding that he would not likely be tortured. So if you could point me to that specifically. I understand the procedural history and. Okay. Petitioner is, suggests that the crack police, which is as acknowledged by both the immigration judge and the board, a separate body from the municipal government police. But however, your honors, the country reports and the evidence of the 26 documents submitted by petitioner's expert all indicate and both the agency acknowledges that the crack police are a separate entity, but they work alongside. They're not one against the other. Petitioner suggests that the reason why the crack police captured the murder of his brother was because the police weren't doing their job. However, your honor, there's, you can't have acquiescence by the government unless the government were made aware of the son's, the brother's murder. Didn't the police superintendent from the region, who is a government official, he was aware of the brother's murder and in fact stated that he was concerned that the petitioner should not return because he would not be safe and might suffer the same fate as his brother. He might suffer the same fate. However, he did not, he indicated in that letter, and your honor, I have the letter, it states that the crack police is the entity that convicted the killer and has imprisoned him. It also, that letter also says, and I, the reality, quote, the reality is that if he returns to Mexico, his life is in danger in this locality and in Mexico in general. In general, your honor, but in this particular circumstance, you know, seeking cat protection is not just based upon general reports of LGBT indigenous persons facing that. This is the police chief of the region corroborating the contention that there's violence against the LGBT community, particularly if they're indigenous, and that the local police aren't able, aren't in the business of controlling. Your honor, he doesn't state that. What more do you want? His letter at administrative record 384 says, I, the police superintendent, advising him to stay away from here to avoid suffering since he's in a country free from homophobia and acceptance, but that doesn't meet the threshold of cat protection, your honor, he has to show in his very circumstances, he's been here since 2007. Did you, I'm sorry, just to jump in, he, you jumped over the part of the letter he should stay away to avoid from suffering the same fate or the misfortune that befell to his brother. So that is something specific to his circumstance, the fact that this police superintendent says, he knows that the brother was murdered and is warning him that he's at risk of that. But he doesn't say that if he comes back, we won't protect him. So there's no acquiescence if the, you know, if the government has no knowledge of what had happened. And. Doesn't the letter at least suggest that the government would be unable to protect him? It does not, your honor. It does not say is unable, it just suggests, you're in a free country, you might as well stay there. And that's all that letter says. And that's not enough for cat protection. What does it mean, though, if the letter says, if he returns, his life is in danger in this locality and in Mexico, that does suggest that at least that the superintendent doesn't have confidence that he'll be protected. Well, your honor, I point you again to, that's that police superintendent's opinion in that case. The human rights reports say Mexican laws have been improved, discrimination against LGBTI indigenous persons are strictly enforced now. You know, and will we accept that premise?  Doesn't the country condition evidence also say discrimination is prevalent? The government does not always investigate and punish abuses. There have been a number of homicides in Mexico of people in the community. Isn't that, that's part of the country condition evidence as well. That is, your honor, and the agency has acknowledged that, both the board and the IJ. But in the particular circumstances where a petitioner is seeking cat protection for torture, torture is not just, you know, oh, I'm in risk of danger. Torture means extreme inhumane treatment by or with the, at the instigation of, or with the acquiescence of the government. Petitioner's brother, in this case, and his family admitted they never informed the police of this at any time. And this goes, again, to the second issue of due process. The reason why the expert testimony would, would not help in this manner, she supposedly is going to focus on acquiescence. There's no acquiescence unless the government knows. If you look at the trial transcript when the judge hones in on that very issue, he asks, okay, you have a 51-page report of your expert stipulated to, by the government, stipulated to, by the judge. We'll accept it, but you're focusing on acquiescence. Has the, the killer of the brother's family, were they, did they, were they made known of this death? And up to the end, the petitioner's counsel made excuses until the very last, and, and she said no. The police chief who wrote the letter knew about it, didn't he? I'm, I'm sorry? The brother. That's correct, your honor. But he also says that this person, the, the killer was prosecuted and put into jail by the, the community police. And he's there, sentenced to 80, 80 years. And he doesn't say crack police, you know, will let him out or give any examples of other types of releasing. That doesn't make any sense to me. If what you said is true, why would the police chief be, if regular procedures were followed in this community, why would the police chief be writing him, telling him, don't come back here? because your safety can't be guaranteed. Well, the police chief wrote that letter because petitioner's godmother asked him to. The, the, the point is, your honor, the police chief. Are you suggesting he just made it up to make a. No, your honor, I'm not, I'm not suggesting that at all. And the agency took that into account, but they said the other objective evidence does not point to the fact that this person, this petitioner in this particular circumstance would face torture. So in the government's view, what kind of problems, if any, do indigenous LGBT community members have in Mexico? Is this just fanciful, it's all made up, the problem doesn't exist? No, your honor, in fact a lot of the reports that were put into evidence by the petitioner and her expert, and, and his expert had to do with actually singing the praises of the crack police and saying that, because, you know, there's a general. Are there members of this community subject to abuse in Mexico, in rural Mexico? I'm sorry? Are members of this LGBT community, particularly those who are from an indigenous background, subject to abuse in rural Mexico? Yes, your honor. But, you know, again, just showing general abuse or harm against such persons, I mean, that's the case here in the United States. LGBT people are subject to discrimination, just as they are in Mexico. But Mexico, like the United States, has laws prohibiting it. You're saying that the situation here in the United States is comparable to the situation in Mexico? No, your honor, but what I'm suggesting is that even though we have laws that prohibit it, there's going to be discrimination or harm against it, but it doesn't amount to torture in petitioner's case. And that's why we submit, the agency considered the totality of evidence, each part in the aggregate, and there's no evidence compelling a contrary finding. Thank you, Your Honor. Yes. We'll hear rebuttal. Thank you, Your Honor. The standard for government acquiescence is willful blindness, which means that the government must be aware of a risk and then subsequently deny to intervene and prevent that risk. And the government contends that there's no awareness here, but the police superintendent letter shows that very awareness. And the government also contends that we're just relying on generalized country conditions evidence, but it can't get any more particular than the evidence in this case. Mr. Santiago's blood brother was murdered for the very characteristic that they share, and that they are gay men. And beyond that, Mr. Santiago is a transgender rights advocate, which the immigration judge on 59 of the record indicated that he would be recognized as if he returns. And Mr. Santiago has said that he would be more impassioned to do this work because his brother was killed. And so when you add up that characteristic with what Mr. Santiago's brother had, it doesn't get any more particular than that. And this record compels a contrary conclusion to the one the immigration judge made. Thank you, your honors. I think we asked you this, but I'm still, I don't mean to belabor this, but I will. How long, does the record reflect how long this man has been detained? Three years, your honor. Thank you. Thank you. Thank you both. We'll take the matter under advisement.